United States Court of Appeals,

Eleventh Circuit.

No. 93-9298.

Leonard HARTSFIELD, Sr., Mattie Hartsfield, Plaintiffs-Appellants,

v.

D.G. LEMACKS, Individually and in his official capacities as Sheriff of Clayton County and as a member of The Clayton County Narcotics Unit, Robert E. Keller, individually and in his official capacities as District Attorney of Clayton County and a member of The Clayton County Narcotics Unit, Ricky McCane, individually and in his official capacities as a Police Officer with the Clayton County Police Department and a Narcotics Agent with The Clayton County Narcotics Unit, Ronnie Clackum, individually and in his official capacities as Police Chief of Clayton County and a member of The Clayton County Narcotics Unit, Don Colburn, individually and in his official capacities as an investigator with the Clayton County District Attorney's Office and Chief Agent of The Clayton County Narcotics Unit, et. al., Defendants-Appellees.

April 24, 1995.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:92-cv-423-RHH), Robert H. Hall, Judge.

Before KRAVITCH, Circuit Judge, and GODBOLD and RONEY, Senior Circuit Judges.

KRAVITCH, Circuit Judge:

This case arises out of an entry by law enforcement agents into the wrong residence to execute a presumably valid search warrant for a nearby house. Plaintiffs-Appellants Leonard and Mattie Hartsfield contest the district court's grant of summary judgment on, and dismissal of, their constitutional claims brought pursuant to 42 U.S.C. § 1983. We AFFIRM in part, REVERSE in part, and REMAND.

I.

"[T]he issue of a government official's qualified immunity from suit presents a question of law, and "like the generality of

such questions, must be resolved *de novo* on appeal.' " *Jordan v. Doe,* 38 F.3d 1559, 1563 (11th Cir.1994) (quoting *Elder v. Holloway,* --- U.S. ----, ----, 114 S.Ct. 1019, 1022, 127 L.Ed.2d 344 (1994)). "Moreover, when a defendant moves for summary judgment based on the doctrine of qualified immunity, the court must view the facts in the light most favorable to the plaintiff." *Hardin v. Hayes,* 957 F.2d 845, 848 (11th Cir.1992). Therefore, the "facts," as stated below, may not, in reality, be the facts that would be established at trial. *See Rodgers v. Horsley,* 39 F.3d 308, 309 (11th Cir.1994); *Swint v. City of Wadley,* 5 F.3d 1435, 1439 (11th Cir.1993), *modified,* 11 F.3d 1030 (11th Cir.1994), *vacated in part on other grounds,* --- U.S. ----, 115 S.Ct. 1203, --- L.Ed. ---- (1995).

There are two groups of defendants in this case. The first group consists of Clayton County Sheriff D.G. Lemacks, Clayton County District Attorney Robert E. Keller, Clayton County Police Chief Ronnie Clackum, and the Chairman of the Clayton County Board of Commissioners, Dal F. Turner (hereinafter referred to together as "the Group One Defendants"). The second group consists of law enforcement agents present at the scene of the search: Ricky McCain and George Randall Dewberry,[1] officers with the Clayton County Police Department; Don Colburn, an investigator with the Clayton County District Attorney's Office; and Michael Wayne Newton, David Noe, Samuel Smith and Randall Dewberry, all deputy sheriffs with the Clayton County Sheriff's Department (hereinafter

---

[1]McCain's name is misspelled as "McCane" in the caption of this case and was misspelled at times in the district court as well.

referred to together as "the Group Two Defendants"). All of the Group Two Defendants, except for Smith, were also assigned to the Clayton County Narcotics Unit ("CCNU").[2]

During the late afternoon of February 21, 1991, Deputy Sheriff Mike Newton went with a confidential informant ("CI") to a residence located at 5108 Middlebrooks Drive, Forest Park, Georgia; the CI entered and purchased marijuana from a black female known as Nora Grooms,[3] while Newton waited outside in his vehicle.[4] Based upon the foregoing, later that day, Newton obtained a search warrant for the residence at 5108 Middlebrooks Drive.

The next day, February 22, 1991, at approximately 2:30 p.m., Newton erroneously led other law enforcement agents to 51*28* Middlebrooks Drive to execute the search warrant, despite the fact that the warrant in his possession designated the residence to be searched as 51*08* Middlebrooks Drive. None of the other officers had seen the search warrant prior to entry.

After Newton forcibly opened the side door using a battering ram, Defendant Officer Samuel Smith and his partner J.F. Watkins entered the residence with weapons drawn and identified themselves as officers executing a search warrant. Watkins discovered Plaintiff-Appellant Mattie Hartsfield undressing in her bedroom, pointed his weapon at her face, and escorted her to the den. After they determined that no one else was present in the house, Smith

---

[2]Colburn was the Special Agent in Charge of the CCNU.

[3]Plaintiff-Appellant Mattie Hartsfield is also an African-American woman.

[4]Another officer followed to provide back-up surveillance and to assist in the controlled drug buy.

and Watkins holstered their weapons; approximately six other officers, and at least one media representative, then entered the residence.[5]

Upon questioning, Mattie Hartsfield insisted that no one had purchased marijuana out of her house. Newton ordered that a Clayton County drug dog be brought into the house;[6] the dog "alerted" on several baseball caps contained in a cabinet in the den. Mrs. Hartsfield explained that one of her sons had been involved with "dope," but an inspection of the cabinet revealed no contraband. Although the cabinet was the only property searched in the house, the officers did walk through the house and visually inspect the premises. When Defendant Officer David Noe finally asked Mattie Hartsfield if she was Nora Grooms and whether there were any drugs in the house, she responded in the negative and stated that Grooms lived up the street. Noe then obtained the search warrant from Newton and saw that the officers had entered 5128 Middlebrooks Drive instead of 5108 Middlebrooks Drive, as specified on the warrant. The search, which lasted for at least 10-15 minutes, then concluded.[7] As Newton departed, he saw the

---

[5]Defendant Officer Ricky McCain remained outside in his vehicle and never entered the residence. Members of the media were apparently present because this raid was a part of a publicized state-wide law enforcement effort know as "Operation Crack Attack."

[6]It is unclear whether the dog was brought in after Mrs. Hartsfield professed her lack of involvement with drugs.

[7]The duration of the search is in dispute; the record strongly suggests that the search lasted no more than 15 minutes, but Officer McCain testified that he was outside of the residence for 30 minutes to an hour, which might indicate that the search lasted longer.

house on the corner, 5108 Middlebrooks Drive, and realized that he had led the officers to the wrong address.

At approximately 6 p.m. that same day, Noe and McCain returned to the Hartsfields' residence, apologized for the entry and offered to pay for repairs to the damaged side door. The Hartsfields never requested reimbursement, and the record suggests that the door has not been repaired.

Evidence before the district court showed that the Hartsfields' residence was distinguishable from Grooms's house. 5108 Middlebrooks was a corner house on a dead-end street, whereas 5128 Middlebrooks was further down the block; the two houses were separated by at least one other residence. Further, one witness testified that the Hartsfields' house differed in that it had a fence around it, and that Grooms's house had junk cars and the like strewn outside. Most important, it is uncontroverted that the entry occurred during daylight hours and that the house numbers were clearly marked. Moreover, there were no exigent circumstances involved; on the contrary, the raid had been carefully staged and the officers were accompanied by representatives of the media.

Mattie Hartsfield and her husband Leonard Hartsfield, Sr. filed this lawsuit, alleging that Mattie Hartsfield's rights under the Fourth, Fifth, Eighth and Fourteenth Amendments were violated by the wrongful search of the house and her simultaneous restraint; several state law claims were also asserted. The defendants moved for, and the district court granted, summary judgment as follows: (1) in favor of all defendants on the claims against them in their official capacities; (2) to McCain and the Group One Defendants on

the Fourth Amendment claim; (3) to everyone but Newton and Dewberry on the Fifth Amendment claim; (4) to the Group One Defendants on the Fourteenth Amendment claim; and (5) to McCain on Plaintiffs' state law trespass claim. The district court denied summary judgment without prejudice on the Eighth Amendment claim, and granted Plaintiffs leave to amend their complaint to state cognizable claims on certain counts. It also granted the remaining defendants leave to refile their motion as to claims for which summary judgment had been denied without prejudice.

Plaintiffs filed an amended complaint, and both groups of defendants responded by again moving for summary judgment.[8] The district court granted all defendants' motions for summary judgment on the Fourth, Fifth and Fourteenth Amendment claims; granted the motion to dismiss on the Eighth Amendment claim; and dismissed the state law claims without prejudice. This appeal followed.

## II.

Appellants' brief challenges the rulings of the district court as to the Group Two Defendants. It makes no mention of the Group One Defendants, however, nor of any claimed error by the district court in disposing of the claims against them. We note that "[i]ssues that clearly are not designated in the initial brief ordinarily are considered abandoned." *Allstate Ins. Co. v. Swann,* 27 F.3d 1539, 1542 (11th Cir.1994). We thus consider any potential arguments on appeal as to the Group One Defendants to be abandoned, with the exception of the district court's dismissal of the Eighth

---

[8]The Group Two Defendants also filed a motion to dismiss on the Eighth Amendment claim.

Amendment claim, which arguably remains before us. *See Love v. Deal,* 5 F.3d 1406, 1407 n. 1 (11th Cir.1993) (brief did not address issue, and hence it was deemed abandoned); *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573 n. 6 (11th Cir.1989) (failure to elaborate argument in brief resulted in abandonment of issue).

III.

A.

This court utilizes a two-part analysis for the defense of qualified immunity. First, the defendant government official must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. If the defendant meets this burden, the plaintiff must then demonstrate that the defendant violated clearly established law based upon objective standards. *See Jordan,* 38 F.3d at 1564; *Eubanks v. Gerwen,* 40 F.3d 1157, 1160 (11th Cir.1994).[9]

There is no doubt in the present case that the officers were acting within their discretionary authority, so the sole issue is whether their actions violated clearly established law.[10]

---

[9]"In the posture of a motion for summary judgment, this second issue itself has two subparts: first, whether the applicable law was clearly established at the time of the governmental action; and second, whether a genuine issue of fact must be resolved to determine if the government official's conduct violated clearly established law." *Eubanks,* 40 F.3d at 1160 (citing *Courson v. McMillian,* 939 F.2d 1479, 1487-88 (11th Cir.1991)).

[10]*Compare Courson v. McMillian,* 939 F.2d 1479, 1497-98 (11th Cir.1991) (for qualified immunity purposes, the law should be from the Supreme Court, the Eleventh Circuit, or if necessary, the highest court of the state in which the case arose) *with Greason v. Kemp,* 891 F.2d 829, 833 (11th Cir.1990) ("[W]e look to the law established by the Supreme Court, the courts of appeals,

Our en banc court recently emphasized the broad scope of protection afforded by qualified immunity:

> That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their *individual capacities*.... Unless a government agent's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit. Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.

*Lassiter v. Alabama A & M University,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (citations and footnotes omitted).

In *Lassiter,* we explained that for law to be clearly established in the qualified immunity context, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Id.* at 1150 (emphasis in original).

> When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar.... Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.

*Adams v. St. Lucie County Sheriff's Dep't,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting) (citation omitted), *approved en banc,* 998 F.2d 923 (11th Cir.1993); *see also Jordan,*

---

and the district courts.") *and Leeks v. Cunningham,* 997 F.2d 1330, 1333 (11th Cir.) ("[W]e consider the law originating in this Circuit, as well as the Supreme Court, the courts of appeals, and the district courts."), *cert. denied,* --- U.S. ----, 114 S.Ct. 609, 126 L.Ed.2d 573 (1993).

38 F.3d at 1566 ("To be clearly established, the "contours' of an asserted constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' ") (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)); *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993) ("If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendants."), *modified on other grounds,* 14 F.3d 583 (11th Cir.1994).

Moreover, plaintiffs cannot discharge their burden simply by referring to general rules or abstract rights. *Lassiter,* 28 F.3d at 1150; *Post,* 7 F.3d at 1557 (plaintiff cannot rely on "general conclusory allegations" or "broad legal truisms") (citing *Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.1989), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989)).

## B.

At the time of the incident in this case it was well-established as "a "basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *see also United States v. Burgos,* 720 F.2d 1520, 1525 (11th Cir.1983) (quoting *Payton* ); *United States v. Satterfield,* 743 F.2d 827, 843 (11th Cir.1984) ("Although a warrantless search and seizure in a home is presumed to be unreasonable ... courts will uphold searches of homes based on both probable cause and exigent circumstances."), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985)

(citation to *Payton* omitted).[11]

It is undisputed that the officers did not have a search warrant for the Hartsfields' residence when they entered the house. Nor did they have probable cause to believe that a crime was taking place at the Hartsfields' house. As such, the officers should have known that entry risked violating the residents' constitutional rights. Nevertheless, in *Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), the Supreme Court held that the accidental search of the wrong apartment did not violate the Fourth Amendment where police mistakenly thought that there was only one apartment on the particular floor of the building, because "the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment."  *Id.* at 88-89, 107 S.Ct. at 1019.[12]

---

[11]*Cf. United States v. Campbell,* 920 F.2d 793, 795 (11th Cir.1991) ("A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law.");  *United States v. Alexander,* 835 F.2d 1406, 1408 (11th Cir.1988) ("The basic premise of search and seizure doctrine is that searches undertaken without a warrant issued upon probable cause are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' ") (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)) (automobile search context).

[12]In *Garrison,* the officer:  (1) went to the premises to see if it matched the description given by an informant;  (2) checked with the Baltimore Gas and Electric Company to ascertain in whose name the third floor apartment was listed;  and (3) checked with the Baltimore Police Department to make sure that the description and address of the suspect matched the information provided by the informant.  *Garrison,* 480 U.S. at 81-82, 85-86 n. 10, 107 S.Ct. at 1015, 1017 n. 10.  Furthermore, the police in *Garrison* encountered both Harold Garrison and the original suspect, Lawrence McWebb, at the building and neither of them indicated to police that there were two apartments on the same floor.  *Id.* at

At the time of the officers' entry into the Hartsfields' home, it was thus clearly established law that, absent probable cause and exigent circumstances, a warrantless search of a residence violates the Fourth Amendment, unless the officers engage in reasonable efforts to avoid error.

Newton had been to the proper residence the day before the search and had procured the search warrant based upon his own observations supervising a drug buy at 5108 Middlebrooks. Although Newton had the warrant in his possession, he did not check to make sure that he was leading the other officers to the correct address, let alone perform any precautionary measures such as those performed by the officers in *Garrison.* As it is uncontroverted that the numbers on the houses are clearly marked, and that the raid took place during daylight hours, simply checking the warrant would have avoided the mistaken entry. Moreover, evidence before the court showed that the houses were located on different parts of the street, separated by at least one other residence, and that their appearances were distinguishable.

Because Newton did nothing to make sure that he was leading the other officers to the correct residence, we conclude that the district court erred in holding that he was protected by qualified immunity. Although we recognize "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants," *Garrison,* 480 U.S. at 87, 107 S.Ct. at 1018, Newton's actions in this case were simply not "consistent with a reasonable effort to

81-82 n. 2, 107 S.Ct. at 1015 n. 2.

ascertain and identify the place intended to be searched" as dictated by *Garrison.*  *See id.* at 88-89, 107 S.Ct. at 1019.

Although the Hartsfields have failed to direct us to an identical case in which an officer's actions were held to be unconstitutional, to be clearly established "does not mean that a court must have previously found the very action in question to be unlawful, but it does mean that "in light of preexisting law the unlawfulness must be apparent.' "  *Jordan,* 38 F.3d at 1566 (quoting *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039).  Given the *per se* rule against warrantless searches, and the *Garrison* court's description of reasonable police efforts, Newton should have known that his behavior risked violating the law, due to the unreasonable manner in which he executed the search warrant.  *Cf. Duncan v. Barnes,*  592  F.2d  1336,  1337-38  (5th  Cir.1979)[13]  (law enforcement officers executing warrant that contained the wrong address could incur liability under § 1983);[14]  *Wanger v. Bonner,*

---

[13]The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[14]Although *Duncan* is not directly on point, it is informative.  In *Duncan,* police obtained a warrant to search Flavio Benavidez's residence for heroin.  The warrant incorrectly directed the police to Appellants' apartment.  Law enforcement officers broke down the rear door, entered with guns drawn, and broke down the bedroom doors.  Male and female occupants were forced to stand nude while the police surveyed the apartment. The officers were not sure that they were in the wrong apartment until ten minutes after their entry;  the apartment was left in disarray, and personal property was destroyed.  The former Fifth Circuit held that "[l]aw enforcement officers having a good faith and reasonable belief in the validity of the search warrant may nonetheless incur liability under 42 U.S.C. § 1983 ... if the warrant is executed in an unreasonable manner....  A reasonable jury could have held that appellees' execution of the search warrant was malicious, arbitrary and capricious."  *Duncan,* 592

621 F.2d 675, 681-82 (5th Cir.1980) (search of residence in middle of the night for fugitive from misdemeanor traffic charge, based solely on address in arrest warrant—which had twenty to twenty-five percent chance of being incorrect and which long-time owner of the premises said was wrong—was not reasonable in absence of any attempted verification of address or prior attempt to serve at more reasonable hour, and thus supported § 1983 action).[15]  Accordingly, we REVERSE the district court's grant of summary judgment in favor of Newton on the basis of qualified immunity on the Hartsfields' Fourth Amendment claim.

C.

As for the other Group Two Defendants, nothing in the record indicates that these officers acted unreasonably in following Newton's lead, or that they knew or should have known that their conduct might result in a violation of the Hartsfields' Fourth Amendment rights.  Consequently, the district court did not err in granting summary judgment on the basis of qualified immunity in their favor on the Hartsfields' Fourth Amendment claim.[16]

AFFIRMED in part, REVERSED in part, and REMANDED.

---

F.2d at 1338 (citations omitted).

[15]*Wanger v. Bonner* was decided prior to the Supreme Court's decision in *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), in which the Court held that a search warrant is required to enter the home of a third party to arrest a suspect named in an arrest warrant.

[16]After a review of the record, we also hold that the district court did not err by granting summary judgment on Appellants' Fifth and Fourteenth Amendment claims, and by dismissing their Eighth Amendment claim.